Filed 6/23/14  In re C.H. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re C.H. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  J.H.,  Defendant and Appellant. | E060512  (Super.Ct.Nos. J246170, J246171, J246172, J246173)  **OPINION** |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Dawn M. Messer, Deputy County Counsel, for Plaintiff and Respondent.

J.H. (mother) appeals from an order terminating parental rights to four of her children. She contends that her visitation and contact with the children were so positive as to prevent termination of parental rights under the "beneficial parental relationship" exception. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).) This "may be the most unsuccessfully litigated issue in the history of law . . . ." (*In re Eileen A*. (2000) 84 Cal.App.4th 1248, 1255, fn. 5, disapproved on other grounds in *In re Zeth S*. (2003) 31 Cal.4th 396, 413–414.) Although it may have merit in an appropriate case, this is not such a case. Hence, we will affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

The mother and her husband C.H., Sr. (father) lived with five of the mother's children:

| Child | Sex | Age at Filing of Dependency | Age Now |
|-------|-----|------------------------------|---------|
| D.B. | Son | 16 | 17 |
| R.L. | Daughter | 11 | 13 |
| Ale.H. | Daughter | 5 | 7 |
| Aly.H. | Daughter | 2 | 4 |
| C.H. | Son | 5 mos. | 2 |

The father was the presumed and biological father of the youngest three children.

In September 2012, the police received a report that the family had lost their home to foreclosure, they were about to be "kicked out" of a motel for nonpayment, and the five children had been left alone in the motel room.

When the police responded, they found the five children alone in the motel room, as reported. Although the oldest child, D.B., was 16 and thus potentially capable of baby-sitting, the police found him asleep. He and the other children did not have access to a phone. When the police asked them how to reach the parents, they provided four phone numbers, including both parents' cell phone numbers, but the police were unable to contact the parents. D.B. said that the mother regularly left them home alone, "about four days a week for four to six hours."

After the police had been on the scene "for several hours," the father arrived. He "appeared [to be] under the influence of an unknown substance." He admitted using prescription hydrocodone and Soma. "[T]hroughout the interview with [the father], his statements were inconsistent and vague." However, he admitted that he had left the children in the room alone, to go to the welfare office. He also said that the mother had bipolar disorder, adding, "She's loony, I don't trust her half the time."

At the request of the police, the father phoned the mother, who then "reluctantly" returned to the motel room. She, too, "appeared to be under the influence of an unknown substance." She admitted using prescription hydrocodone, Xanax, and Soma.[1] She also

---

[1]    A combination of hydrocodone and Soma is called a "Las Vegas cocktail"; a combination of hydrocodone, Soma, and Xanax is called a "Houston cocktail." Both are said to mimic the effects of heroin.

*[footnote continued on next page]*

admitted leaving the children unattended "throughout the week." "[T]he mother . . . was extremely evasive, combative, hostile, and provided very inconsistent statements with regard to her whereabouts, her substance use, the care she provides for her children, and what she does all day when she leaves the children unattended."

At the end of the interview, the police arrested both parents for child endangerment. (Pen. Code, § 273a.) The Department detained all five children and filed dependency petitions regarding them.

Three days later, the charges were dropped and the parents were released. When drug-tested, the mother was positive for benzodiazepines (presumably Xanax), for opiates (presumably hydrocodone), and for amphetamines.

On October 31-November 1, 2012, D.B. ran away. As a result, the juvenile court never took jurisdiction over him, and he is not a party to this appeal. The mother, however, admitted talking to him on the phone daily. Although the father denied it at the time, he later admitted that D.B. was "with him."

As a result of mediation, the parents submitted on amended allegations that both parents had "a history of substance abuse," were "unable to provide permanent housing," and had "left the children with minimal supervision," and that the mother had "unresolved anxiety issues."

---

*[footnote continued from previous page]*
(<http://www.justice.gov/archive/ndic/pubs10/10913/10913p.pdf>, as of June 17, 2014; <http://www.chron.com/news/houston-texas/article/Harris-leads-state-in-doctors-doling-out-potent-1712372.php>, as of June 17, 2014.)

In November 2012, at the jurisdictional/dispositional hearing, the juvenile court found that it had jurisdiction based on failure to protect. (Welf. & Inst. Code, § 300, subd. (b).) It formally removed the children from the parents' custody. It ordered reunification services for both parents.

During the reunification period, the parents generally evaded contact with the social worker and failed to comply with their reunification services plans.

In February 2013, the parents separated and the father moved to Montana. It was later revealed that he took D.B. with him. The Montana authorities either failed or refused to enforce a warrant for D.B.'s return.

Meanwhile, also in February 2013, after a series of unsatisfactory placements, the other four children were placed with the father's mother (paternal grandmother). She indicated that she wanted to adopt them.

In March 2013, the mother was arrested and charged with two counts of possession of a controlled substance while armed with a firearm (Health & Saf. Code, § 11370.1, subd. (a)), two counts of sale or transportation of a controlled substance (Health & Saf. Code, § 11352, subd. (a)), and one count of unlawful possession of a firearm (Pen. Code, § 29800, subd. (a)(1)). She denied guilt.

In June 2013, at the six-month review, hearing, the juvenile court terminated reunification services and set a hearing pursuant to Welfare and Institutions Code section 366.26 (section 366.26).

In September 2013, the mother was convicted of the lesser offense of possession of drug paraphernalia and sentenced to jail.

As of the section 366.26 hearing, in December 2013, the mother was still in jail. She was seeking "work release and/or monitoring," but if that fell through, she would remain incarcerated for up to four months. The mother's counsel requested "a lesser permanent plan so that her parental rights are not terminated today." The juvenile court found that the children were adoptable and that there was no applicable exception to termination. Accordingly, it terminated parental rights.

## II

## THE BENEFICIAL PARENTAL RELATIONSHIP EXCEPTION

A.     *Additional Factual and Procedural Background.*

The evidence before the juvenile court at the section 366.26 hearing consisted of the social worker's report for the hearing, plus the oral testimony of the mother, the social worker, and the adoption social worker. We confine our review to this evidence (see Welf. & Inst. Code, § 366.26, subd. (b)), which showed the following.

During the reunification period, the mother had had visitation once a week for two hours. She missed some visits. Moreover, she was "consistently an hour or more late . . . ."

According to the mother, the children called her "Mommy" or "Mom." They told her they loved her and missed her and wanted to go home with her. Aly.H. would cry when it was time to leave.

6

After reunification services were terminated, the mother's visitation was reduced to once a month. Thereafter, the mother had just one visit — in August 2013. She arrived late. Aly.H. and Ale.H. were "visibly excited" to see her, though Ale.H. was "disappointed" at her being late. R.L., however, "was initially reluctant to engage with the mother . . . ." C.H. was "indifferent" and "presented with a flat affect throughout most of the visit."

The mother was in custody from September 2013 on, and therefore was not able to visit again.

As of the date of the section 366.26 hearing, the children had been placed with the paternal grandmother for approximately 10 months. They were "very bonded" with her. They were "safe" and "happy." The social worker reported that "[t]hey like the life they're living."

According to the adoption social worker, R.L., Aly.H. and Ale.H. all wanted to be adopted. R.L. wrote a letter to the court saying that she wanted to live with the paternal grandmother and to be adopted by her, "because I f[ee]l comf[orta]ble with her, and so do[] my brother and sisters." She added that her brother and sisters were very attached to the paternal grandmother.

The mother did not believe that R.L. wanted to be adopted because R.L. told her that she wanted to come home. She thought that R.L. did not understand what adoption was. She also thought that R.L. believed that the alternative to adoption was being "in a foster home and separated from her siblings," rather than being at home with the mother.

The social worker testified that she and R.L. had a "lengthy discussion" about adoption, and R.L. "did seem to have an understanding of what it meant." R.L. seemed "comfortable" with adoption. "[H]er response was more about protecting her younger siblings because she felt that [she] and her siblings had been disappointed so much by their mom, she didn't want to be disappointed anymore."

The juvenile court found that the beneficial parental relationship exception did not apply. Specifically, it found that the mother had not visited regularly, and it found that the mother had not shown that the children would benefit from maintaining the parent/child relationship.

B.     *Analysis*.

"Adoption is the Legislature's preferred permanent plan. [Citation.]" (*In re D.M.* (2012) 205 Cal.App.4th 283, 290.) Thus, as a general rule, at a section 366.26 hearing, if the juvenile court finds that the child is adoptable, it must terminate parental rights. (Welf. & Inst. Code, § 366.26, subds. (b)(1) & (c)(1).) There is an exception to this rule, however, if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (*id*., subd. (c)(1)(B)) for one of six specified statutory reasons. (*Id*., subd. (c)(1)(B)(i)-(vi).) One such reason is that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i).)

"The 'benefit' prong of th[is] exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to

8

outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) "'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re Michael G.* (2012) 203 Cal.App.4th 580, 594.)

"[T]he parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits— the parent must show that he or she occupies a parental role in the life of the child. [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.) "'Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent.' [Citation.]" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

"The parent contesting the termination of parental rights bears the burden of showing *both* regular visitation and contact *and* the benefit to the child in maintaining the parent-child relationship. [Citations.]" (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81, italics added.)

9

There is some room for doubt as to whether we review the trial court's finding on this issue under a substantial evidence standard or an abuse of discretion standard. (See generally *In re K.P.*, *supra*, 203 Cal.App.4th at pp. 621-622.) But "[t]he practical differences between the two standards of review are not significant. '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. Broad deference must be shown to the trial judge. The reviewing court should interfere only if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' [Citations.]" (*In re Jasmine D*. (2000) 78 Cal.App.4th 1339, 1351.)

Here, the juvenile court could reasonably find, based on the evidence, that the mother had not maintained regular visitation and contact. During the reunification period, she was consistently an hour or more late for visits that were only two hours long; she had also missed some visits. Moreover, in the six months since the reunification period ended, she had had only one visit, and she was late for that visit, too. She testified that she "never missed a visit," but the juvenile court was not required to accept that testimony. Indeed, she admitted that she did not visit while incarcerated.

The mother does not appear to argue that we should overlook her failure to visit during her incarceration. If only out of an excess of caution, however, we note that her *ability* to visit during this period was irrelevant. The issue is whether she *did or did not* visit regularly. This test is not fault-based. A parent who was incarcerated continuously from the beginning of the dependency until the end could not claim the beneficial

10

relationship exception on the theory that he or she would have liked to visit, but just was not able to. The legislature could reasonably provide that a parent who has not maintained regular visitation and contact with his or her child — for whatever reason — simply does not have the kind of relationship with the child that should prevent the termination of parental rights.

Separately and alternatively, the juvenile court could also reasonably find, based on the evidence, that the well-being the children gained from their relationship with the mother did not outweigh the well-being they would gain from being adopted. R.L., Aly.H. and Ale.H. all wanted to be adopted. (C.H. was too young to express an opinion, but it is inferable that he would have made it unanimous if he could have.) They felt happy, comfortable, and safe with the paternal grandmother.

By contrast, R.L. felt that the mother had repeatedly "disappointed" her and her siblings, and that adoption would "protect[]" them from further disappointment. At the most recent visit, Ale.H. was "disappointed" because the mother was late; R.L. was "reluctant to engage" with the mother; and C.H. was "indifferent."

In her reply brief, the mother argues that R.L. "was 12 years old, and as a preteen girl, it would not be that unusual for her to be slow to engage with any parental figure." Similarly, she argues that C.H. was a "one-year-old baby with limited mobility dropped into an unfamiliar location . . . ." In other words, she asks us to draw every possible inference in her favor. This turns the standard of review on its head. Actually, we are required to draw all possible inferences in favor of the lower court's decision. In that

11

light, it is at least reasonably inferable that the children did not particularly benefit from their visits with the mother.

Admittedly, the mother testified that during visits, the children told her they loved her and missed her and wanted to go home with her. It appears, however, that this related to visits at least six months before the hearing. In any event, the juvenile court could reasonably view this as part of her pattern of disappointing the children — they would enjoy their visits with her, and they would want to go home with her, but she repeatedly let them down by being late, missing visits, and failing to reunify.

We therefore conclude that the juvenile court did not err by finding that the beneficial parental relationship exception did not apply. Indeed, we believe that, if it had found that the exception did apply, it would have erred.

## III

## DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.

12